**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

KONINKLIJKE PHILIPS N.V.,

                                    *Plaintiff*,

    v.                                                          **JURY TRIAL DEMANDED**

BLU PRODUCTS, INC.,

                                    *Defendant*.

## COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff Koninklijke Philips N.V. (formerly known as Koninklijke Philips Electronics N.V.) ("Philips" or "Plaintiff"), by its counsel and pursuant to Federal Rule of Civil Procedure 8(a), alleges the following in support of its Complaint against Defendant BLU Products, Inc. ("BLU Products" or "Defendant") for patent infringement:

## INTRODUCTION

1.      Philips is a world-renowned company that researches and develops technology in numerous fields and offers a diverse array of products.  Philips' extensive research and development efforts have resulted in thousands of issued patents.  One of the areas of Philips' research is video coding, a technology used in many millions of computers, smartphones, media players, and personal devices to record, stream, and play high-quality video content.  This case arises from Defendant's intentional and persistent infringement of video-coding inventions that Philips developed and patented.

2.      The Philips inventions at issue in this litigation (the "Inventions") are widely recognized as creating significant advancements in video-coding compression technologies.  The Inventions have been adopted by industry organizations to improve upon earlier technologies,

and have been awarded patents by the United States Patent and Trademark Office and other patent agencies around the world.  The patents infringed by Defendant here are U.S. Patent No. 8,391,371 ("'371 Patent") and U.S. Patent No. 9,560,349 ("'349 Patent") (together, the "Asserted Patents," attached as Exhibits 1 and 2, respectively).  These patented inventions are incorporated into an industry standard technology known as Advanced Video Coding ("AVC") or H.264, which is the most widely used digital video coding standard and is used in set-top boxes, media player and other personal computer software, mobile devices including telephones and mobile television receivers, Blu-ray Disc$^{TM}$ players and recorders, Blu-ray video optical discs, game machines, personal media player devices, video cameras, subscription and pay-per view or title video services, free broadcast television services, and other products and services.

3.      To date, more than 1,600 manufacturers of consumer products and software developers have taken a license to implement the AVC Standard, which enables clear video streaming on consumer devices such as smartphones.  Most manufacturers of these devices and services, including almost every smartphone manufacturer, have licensed and recognized the value of Philips' inventions (such as the technology claimed in the Asserted Patents), as well as the validity and enforceability of Philips' patent rights with respect to that technology.  The manufacturers that have been licensed—including Apple, Google, Microsoft, LG, Samsung, Sony, Huawei, Lenovo (Motorola), and Vivo Mobile Communication Company—compete directly with Defendant, which sells and offers to sell infringing devices, including smartphones, in this country.  However, unlike the Defendant, these other companies respect their intellectual property obligations and have obtained licenses for the right to incorporate Philips' patented inventions into their products, hundreds of millions of which have been sold to U.S. consumers.

4.      Defendant has configured its products to include Philips' patented technology, thus recognizing the value of the inventions' advances, but has refused to take a license. Because they incorporate Philips' technology, including the Asserted Patents, Defendant's infringing devices can play high-quality video files and stream high-quality internet video content, thus competing directly with products manufactured by licensees who respect Philips' intellectual property.  Philips cannot and will not allow manufacturers such as Defendant to intentionally infringe Philips' patents and profit from its inventions while refusing to pay a reasonable royalty for a license.  In short, Philips will not allow the theft of its intellectual property, and files this case seeking to prevent Defendant from continuing to do so.

5.      Defendant has had numerous opportunities to license the patented inventions on fair, reasonable, and non-discriminatory terms, but has refused to do so.  Defendant's failure to take a license has left Philips no choice but to enforce its rights by bringing this action for damages and injunctive relief to remedy and prevent Defendant's unauthorized use of Philips' patented technology.  Without such relief, Philips will suffer irreparable harm because of, among other things, less resources to devote to Philips' research and development efforts, resulting in fewer opportunities to develop innovative technologies, reputational damage and lost good will, and impairment of Philips' licensing program (because licensees and potential licensees will be less willing to pay for Philips' technology if they must compete with other companies that offer the technology without paying for it).  A subsequent money damages award alone will not make up for such harm.  In addition, and because Defendant's infringing conduct reflects its intentional infringement and willful disregard of patent rights, Philips seeks enhanced damages and an award of its fees and costs.

## THE PARTIES

6.      Plaintiff Philips is a company organized and existing under the laws of the Netherlands, with its principal place of business at High Tech Campus 52, 5656 AG, Eindhoven, the Netherlands.

7.      Philips is the assignee and owner of the '371 Patent and the '349 Patent.

8.      Upon information and belief, Defendant BLU Products is a corporation organized under the laws of Florida with its principal place of business at 8600 NW 36th Street, Ste 300, Doral, FL 33166.

9.      Defendant BLU Products sells and offers to sell in the United States, and imports into the United States, including in this District, mobile devices that infringe the Asserted Patents.

## JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1338(a).

11.     This Court has personal jurisdiction over Defendant because Defendant is a Florida corporation and Defendant has established minimum contacts with Florida.  The Defendant is subject to personal jurisdiction in Florida under, at a minimum, Fla. Stat. § 48.193, Florida's long-arm statute, thereby submitting itself to the jurisdiction of the Florida courts because it has transacted and continues to transact business in the State of Florida, directly and/or through third parties, by importing or causing to be imported, using or causing to be used, offering to sell or causing to be offered for sale, selling or causing to be sold directly, through intermediaries and/or as an intermediary, devices that infringe the Asserted Patents to customers in Florida, and will continue to do so unless enjoined by this Court.

12.     Venue is proper in this district pursuant to 28 U.S.C. § 1400(b), because, *inter alia*, Defendant is incorporated in Florida and has committed acts of infringement in this district

by, among others, importing or causing to be imported, using or causing to be used, offering to sell or causing to be offered for sale, selling or causing to be sold directly, through intermediaries and/or as an intermediary, devices that infringe the Asserted Patent

## THE ASSERTED PATENTS

### A.    The Use of Philips' Patented Inventions in Video Coding

13.     Philips' patented inventions, including those claimed in the Asserted Patents, allow consumer devices to record, compress/decompress, distribute, and play back video content in ways that would not be possible without those inventions.  Philips' inventions are employed by content creators, including movie, television, and video game makers, and used in TVs, computers, and mobile devices to play back and display such content.

14.     The Asserted Patents are infringed by the incorporation and/or use of video decoding technologies and features that enable electronic devices to play certain significantly compressed digital video files.  Using the inventions claimed in the Asserted Patents, along with others that are likewise incorporated into the AVC Standard, compressed digital video signals can be played back with good visual quality at substantially lower bit rates than required by previous video coding standards.

15.     The use of AVC enables consumers to enjoy high-quality video (e.g., to watch movies or for video conferencing) while meeting the storage and other technological limitations of mobile devices as well as limitations in transmission bandwidth affecting the use of such devices within cellular telephone and satellite radio networks.

16.     The inventions claimed in the Asserted Patents are the result of lengthy and costly research by Philips' scientists and engineers, and have been widely recognized as enabling highly efficient high-quality video reproduction in devices such as those sold by Defendant.

17.     Video content generally consists of a connected series of images, or "frames."  A single frame consists of a two-dimensional array of picture elements, or "pixels," arranged in rows and columns.  The visual aspects of each pixel can be represented by data bits—ones and zeros—that indicate its color and brightness.

18.     Depending on the resolution of the image, a single frame may include millions of pixels.  Video encoding, also known as "compression," is a technological process for reducing the amount of data that must be stored or transmitted for each pixel.  To provided uncompressed video with resolution suitable for modern televisions or mobile phones would require the device to process no fewer than 12 billion data bits each second.  Compression with AVC, for example, can reduce this by a factor of 1,000, so that only a few million bits per second must be processed by the device to provide frames that are nearly identical to the uncompressed images.

19.     Thus, encoding/compression allows the sequence of images to be stored efficiently as a file or to be streamed at a lower speed (called "bit rate") via a transmission medium.  The result of video encoding is a "bitstream," a sequence of bits approximating, in their totality, the original image sequence—but using a much smaller amount of data.  The bitstream can be decoded (i.e., decompressed) using the same coding rules in reverse to generate a series of images that can then be displayed on a screen.

20.     To facilitate widespread adoption and interoperability among devices manufactured by different companies, the coding/decoding rules are governed by a standard, in this case the AVC video coding standard.  The AVC Standard describes rules for formatting and communicating the compressed data from one device to another, and how the decoder must behave to correctly decompress this data into a proper reconstruction of the original video images.  The AVC video coding standard, which incorporates and includes the inventions

claimed in the Asserted Patents, permits high-quality video playback coupled with efficient transmission of video signals using a high level of compression. The AVC Standard was published by the ITU-T Video Coding Experts Group together with the ISO/IEC Moving Picture Experts Group.

21. The AVC Standard describes interoperable systems and methods for achieving a high level of compression for moving pictures for various applications such as videoconferencing, digital storage media, television broadcasting, internet streaming, and communication; using the coded video representation in a flexible manner for a wide variety of network environments; and allowing motion video to be manipulated as a form of computer data and to be stored on various storage media, transmitted, and received over existing and future networks and distributed on existing and future broadcasting channels.

22. A compressed AVC-compliant "bitstream" requires only a fraction of the storage space and transmission data rate that the original signal required, resulting in significant cost savings to content providers and end-users by permitting them to send and receive high-quality video while economizing on the amount of storage media and data transmission. These benefits vastly increase the utility and value to consumers of devices such as the infringing devices sold by Defendant.

23. The AVC Standard permits a variety of "profiles" by which a signal may be encoded and decoded to provide images of different quality. In that way, the AVC standard serves a wide range of applications, bit rates, resolutions, qualities, and services. Different profiles incorporate different, often overlapping, portions of the AVC Standard. The various AVC profiles include the Main Profile, a High Profile, an Extended Profile, and a Baseline Profile.

24.     The inventions claimed in the Asserted Patents relate to a technology that is included in at least the AVC Main Profile and High Profile, and finds additional use in the other AVC profiles.  The infringing devices support at least the AVC Main and High Profiles.  They are thus configured to support and require use of the inventions claimed in the Asserted Patents.

25.     The Asserted Patents disclose and claim systems and methods for providing and dealing with data that is "embedded" within other basic information (so-call "main" data) in a bitstream; the embedded data provides information that may be used to enhance the image that can be produced from the main data.  By using the technology disclosed and claimed in the Asserted Patents, any decoder can be configured to either recognize and use the embedded data, or not recognize and ignore it.

26.     The use of the claimed inventions also allows, among other things, backward compatibility for a bitstream created by an encoder based on new versions of the AVC Standard so that the bitstream can still be decoded by a decoder based on a previous version.  The inventions provide a way for new enhancement features to be added (and thus included as embedded data in an AVC bitstream) that will not cause an earlier-created decoder (i.e., one without capability to use the enhanced features) to "crash" if it encounters the embedded data while decoding that bitstream.

27.     According to the common description of the invention provided in the Asserted Patents, an "elemental bitstream" comprises, among other things, (i) main data ("MD") that can be decoded to reproduce an image frame and (ii) a main data descriptor ("MDD"), that tells the decoder how to find and use the main data.  When a device is configured to use the Philips technology claimed in the Asserted Patents, the bitstream may also include embedded data ("ED") within or alongside the main data that can be used to enhance the image decodable from

the main data.  The Asserted Patents claim the definition and location of an embedded data descriptor ("EDD") that tells the decoder where the embedded data is and how to use it if the decoder recognizes the EDD.

28.     The Asserted Patents claim, among other things, methods and systems for decoding a bitstream with MD and ED, as well as an MDD and an EDD.  In each of the claims, a decoder decoding the bitstream is configured to review the EDD.  If the decoder recognizes the EDD, it can use the ED to enhance the picture, but if the decoder does not recognize it, it ignores the ED as well as the EDD.  When a device is configured to use this technology, "a signal having new embedded data descriptors remains backward compatible as regards the main data and main data descriptors."  '349 Patent, at 1:64-66.  In other words, "[b]y providing the embedded data descriptor outside the main data and thus also outside the embedded data, the main data remains compatible [with earlier decoders] and it is further not necessary to access the embedded data itself to get a description of it.  *Id.* 1:66-2:3.

29.     The technology claimed in the Asserted Patents is used in a number of ways in the AVC Standard, but one example is found in AVC's use of Network Abstraction Layer ("NAL") units that partition, organize, and manage different types of coded video data, unlike older video coding standards that merely strung all the bytes together.  In AVC, coded video data is organized into packets that contains an integer number of related "bytes" of data—the combination of digital ones and zeros that represent, for example, a portion of the pixel data that can be decoded to recreate a video frame.  Each such packet is a NAL unit, and the first byte of each AVC NAL unit tells the decoder the type of data in that NAL unit.  Some types of NAL units contain pixel data (i.e., the color or brightness), while other types of NAL units describe, or instruct where to find, and how to use, the pixel data.

30.     The organization of coded picture data into NAL units distinguishes AVC from prior video coding standards.  The use of this technology, enabled by the Asserted Patents, allows AVC-enabled devices like the Accused Products (defined in Paragraph 47, *infra*) to better partition various kinds of data, and to easily include in the bitstream additional data (such as enhancement data) that can be either used or ignored by the decoder.  This permits new features to be added to a bitstream that can be used to enhance a picture while ensuring the bitstream remains backwards compatible with earlier decoders (that can simply ignore the new data).  Older video coding systems, in contrast, put descriptor information in a header in some undivided part of the data stream itself, making it difficult to determine what data the decoder had to decode, and what data it could ignore—such that it was difficult to add new features without compromising compatibility with older decoders.  In these older systems, a decoder had to decode all of the embedded data, even for an application or setting in which it would not be used, to find the bits that described the embedded data.

31.     To take one example, NAL units containing coded video data for an auxiliary picture (NAL unit type 19) can be embedded alongside NAL units with the video data for the main (i.e., basic) image corresponding to a frame (types 1-5); the data for the auxiliary picture can be used, in certain circumstances, to enhance the main image.  Different NAL units, transmitted in the same bitstream, contain information that allows the decoder to find and use the main image data (type 7) and how to find and use the auxiliary picture data (type 13).  A bitstream containing auxiliary picture data thus includes MD, ED, an MDD, and an EDD in separate NAL unit types 1-5, 19, 7, and 13, respectively.

**B.     The '371 Patent**

32.     On March 5, 2013, the United States Patent and Trademark Office issued the '371 Patent, entitled "Embedded Data Signaling," based on an application filed by inventors Marc

Willem Theodorus Klein Middlelink and Jan Van Der Meer.  The '371 Patent claims priority to

European Patent Application No. 02079427, filed on October 22, 2002.  A true and correct copy

of the '371 Patent is attached hereto as Exhibit 1.

33.     The '371 Patent discloses systems and methods for decoding a bitstream

containing MD, ED, an MDD, and an EDD.

34.     Claim 5 of the '371 Patent claims:

A method of decoding a signal within an elementary data stream
via a decoder,

the signal representing main data,

the main data including embedded data,

the main data being provided with a main data descriptor for
signaling content included in the main data,

the elementary data stream being provided with an embedded data
descriptor configured to identify content included in the embedded
data,

> wherein the embedded data descriptor is provided within the
> elementary data stream outside (i) the main data including the
> embedded data and (ii) the main data descriptor of the
> elementary data stream,

the decoding method comprising the steps of:

reading, via the decoder, the embedded data descriptor of the
elementary data stream; and

using the embedded data included in the main data in dependence
on the reading of the embedded data descriptor,

wherein the embedded data content comprises enhancement data
configured to enhance the main data available in the elementary
data stream during reproduction of the main data by a reproduction
unit in response to the reproduction unit being configured to
recognize and interpret the embedded data descriptor,

> else the reproduction unit ignores the embedded data
> descriptor.

35.     Claim 6 of the '371 Patent claims a decoder configured to carry out the method of claim 5.

36.     Claim 8 of the '371 Patent claims a receiver comprising an input unit and a decoder, where the decoder is configured to carry out the method of claim 5.

C.     **The '349 Patent**

37.     On January 31, 2017, the United States Patent and Trademark Office issued the '349 Patent, entitled "Embedded Data Signaling," based on an application filed by inventors Marc Willem Theodorus Klein Middlelink and Jan Van Der Meer.  The '349 Patent is a divisional of the '371 Patent.  Like the '371 Patent, the '349 Patent has a priority date of October 22, 2002.  A true and correct copy of the '349 Patent is attached hereto as Exhibit 2.

38.     The '349 Patent discloses systems and methods for decoding a bitstream containing an MD, ED, an MDD, and a EDD.

39.     Claim 5 of the '349 Patent claims:

> A method of decoding a data stream comprising main video data (MD) including embedded video data (ED), the main video data comprising a main data descriptor (MDD) identifying content included in the main video data, the embedded video data comprising an embedded data descriptor (EDD) identifying content included in the embedded video data,
>
> wherein the embedded data descriptor is provided separately from (i) the main video data and (ii) the main data descriptor,
>
> the decoding method comprising the acts of:
>
>> receiving main video data including embedded video data, and a main data descriptor signaling content included in the main video data;
>>
>> reading, via a decoding apparatus, the embedded data descriptor;
>>
>> extracting, via a decoding apparatus, a code associated with the embedded data descriptor;

determining, via a decoding apparatus, whether the extracted code is recognizable; and

applying, via the decoding apparatus, the embedded video data to the main video data in dependence on the recognition of the embedded data descriptor code.

40.     Claim 6 of the '349 Patent claims a decoder configured to carry out the method of claim 5.

41.     Claim 8 of the '349 Patent claims a receiver comprising an input unit and a decoder, where the decoder is configured to carry out the method of claim 5.

## THE WIDESPREAD USE OF PHILIPS' INVENTIONS AND LICENSING BY OTHERS OF PHILIPS' TECHNOLOGY

42.     After developing its video encoding and decoding technologies, Philips disclosed these advances to the public, applying for and obtaining patent protection from governments throughout the world, including in the United States.

43.     Consumers' use of hardware and software incorporating Philips' inventions is widespread, including in their smartphones to play video files that have been encoded and decoded using Philips' patented technology.

44.     The AVC Standard incorporates and relies on Philips' patented technologies. Devices that incorporate and use the AVC Main Profile and High Profile provide functionality reliant on Philips' patented technologies directly to consumers.  For example, upon information and belief, consumers use the AVC-compliant hardware and software provided by Defendant in the infringing products to play video files that have been encoded and decoded pursuant to the AVC Standard.

45.     For example, many video streaming services, such as Netflix, Hulu, Prime Video, Vimeo, YouTube, and the iTunes Store, rely on Philips' patented inventions, including those claimed in the Asserted Patents, to reduce their storage and transmission costs and improve

quality for the AVC-encoded video they offer.  Millions of viewers on wireless mobile devices also benefit from this use of Philips' technology, because many do not have an "unlimited" wireless data subscription and thus the amount they pay depends upon the amount of wireless data they send and receive.  Philips' technology in these users' smartphones and other devices permits them to experience high-quality video at a substantially reduced cost.  Without the inventions claimed in the Asserted Patents, users cannot view such video offerings, or can only view them in a distorted form.  In addition, some mobile service providers offer "unlimited" data subscriptions to users, often at a higher cost than "limited" subscriptions.  Philips' technology, including the technology claimed in the Asserted Patents, permits these service providers to offer such plans because of the efficiencies made possible through the use of those technologies.  As a consequence, use of the Asserted Patents adds tremendous value to the infringing devices sold by Defendant.  Defendant's Accused Products (defined in Paragraph 47, *infra*) provide consumers with the benefits described above as a result of Defendant's infringement of the Asserted Patents.

46.     Several hundred manufacturers and software developers have recognized the value and technical superiority of the Asserted Patents and have licensed them, with other patents, through a license offered by Via Licensing Alliance ("Via") (formerly MPEG LA).  Manufacturers that have been licensed under the Asserted Patents through Via comprise virtually all of Defendant's primary competitors in the smartphone market, including Apple, LG, Samsung, Sony, Huawei, Lenovo (Motorola), and others.

## BLU PRODUCTS INFRINGE THE ASSERTED PATENTS

47.     Defendant imports, causes to be imported, uses, offers to sell, and/or sells in the United States electronic devices that practice at least claims 5, 6, and 8 of the '371 Patent and claims 5, 6, and 8 of the '349 Patent (the "Accused Products").  The Accused Products are at least capable of decoding and playing video content created using Philips' patented technology.

The Accused Products are smartphones including, but not limited to, smartphone models such as the Blu G93, Blu G73, and Blu G63.

48.     Every device implementing at least the AVC Main Profile or High Profile is configured to use the technology disclosed in the Asserted Patents because it includes a decoder that can parse a bitstream that includes NAL units corresponding to MD, ED, an MDD and an EDD.  It can read the EDD and extract a code (the NAL unit type) to determine whether it recognizes that descriptor.  The decoder then acts according to its determination:  If it recognizes the EDD, it may find and use the embedded auxiliary picture data to enhance the main image.  If it does not, it is configured to ignore both the EDD and the auxiliary picture data.

49.     On information and belief, the Accused Products include both software and hardware decoders that support, and are configured to support, at least the AVC Main and High Profiles.

50.     Defendant, in importing, using, offering to sell, and/or selling the Accused Products, infringes and has infringed, directly or indirectly, at least claims 5, 6, and 8 of the '371 Patent and claims 5, 6, and 8 of the '349 Patent.

51.     Defendant has also directed, controlled, contributed to, and/or induced acts of infringement committed by others, including, for example, by providing and importing smartphones that use the Asserted Patents, and by providing marketing and promotional materials and services as well as instruction manuals and other information to Amazon.com and consumers that promote, describe, instruct, and/or encourage the use of the Accused Products.

52.     Defendant stands virtually alone among major manufacturers or sellers of smartphones and other mobile devices in electing to market products that benefit from

incorporating and using Philips' invention, including the inventions claimed in the Asserted

Patents, while refusing to pay royalties for Philips' inventions.

**NOTICE TO DEFENDANT AND**
**DEFENDANT'S FAILURE TO TAKE A LICENSE**

53.     Since at least July 15, 2004, a license to Philips' AVC patents (and others offered

in the license) ("Via Licensed Patents") has been available from Via and widely publicized.

Since at least August 1, 2020, Via's public website has included the '349 Patent on its list of

Philips' (and others') patents that are essential to implementing the AVC Standard that are

available for license.

54.     Via has regularly reminded representatives of BLU Products of its willful

infringement of the Via Licensed Patents, including the Asserted Patents.  On information and

belief, BLU Products had actual or constructive knowledge of the Asserted Patents no later than

2017, when the '349 Patent issued.

55.     Via has offered a license to BLU Products that would cover the Asserted Patents.

For example, on January 15, 2015, Via met with BLU Products' Vice President of Sales, Elliot

Cohen, to discuss BLU Products' need for coverage under various license agreements, including

the Via Licensed Patents.

56.     BLU Products has never denied that it distributes mobile electronic devices,

including smartphones that use Philips' inventions and/or that infringe claims of the Asserted

Patents.  Nor has BLU Products claimed that the Asserted Patents are invalid or unenforceable.

Nevertheless, BLU Products has not entered into a license to the Asserted Patents from either

Via or Philips.  BLU Products' Mr. Cohen did not respond to many follow-up communications

from 2015 to 2017.  From 2017 to the present, Via has corresponded with BLU Products' outside

counsel, Mr. Bernard Egozi, and has continuously reiterated BLU Products' need for a license

-16-

and the importance of paying for BLU Products' past infringement.  Despite the years of persistent efforts, Mr. Egozi has not agreed to a BLU Products license.

### FIRST COUNT

### (PATENT INFRINGEMENT—'371 PATENT)
### <u>35 U.S.C. §§ 271 AND 281</u>

57.     Plaintiff incorporates and repeats the preceding paragraphs 1 through 56 above as if fully set forth herein.

58.     Upon information and belief, Defendant has directly infringed one or more claims of the '371 Patent (including the claims referred to above) pursuant to 35 U.S.C. § 271(a) by importing, using, selling, and/or offering to sell in the United States products, including, but not limited to, smartphone models such as those listed in paragraph 47.  Upon information and belief, infringement pursuant to 35 U.S.C. § 271(a) by Defendant is ongoing.

59.     Upon information and belief, Defendant has indirectly infringed one or more claims of the '371 Patent (including the claims referred to above) pursuant to 35 U.S.C. § 271(b) by actively and knowingly inducing, directing, causing, and encouraging others, including, but not limited to, original equipment manufacturers ("OEMs"), other manufacturers, designers, distributors, importers, resellers, repair providers, software developers, customers, and/or end users, to make, use, import, sell, and/or offer to sell in the United States, those of Defendant's products including, but not limited to, smartphone models such as those listed in paragraph 47, by, among other things, providing instructions, manuals, technical assistance, and promotional materials relating to the installation, use, operation, and maintenance of said smartphones. Defendant's inducement of infringement pursuant to 35 U.S.C. § 271(b) is ongoing.

60.     Upon information and belief, Defendant has contributed to the infringement of one or more claims of the '371 Patent (including the claims referred to above) under 35 U.S.C.

§ 271(c) by offering to sell, selling, and/or importing into the United States products including, but not limited to, smartphone models such as those listed in paragraph 47, that include AVC decoders embodied in hardware and/or software that include components especially made or especially adapted for use in practicing the method claimed in the '371 Patent, knowing those components to be especially made or especially adapted for use in the infringement of the '371 Patent. These components are not staple articles or commodities of commerce suitable for substantial non-infringing use other than to practice the claimed method. Upon information and belief, Defendant's contributory infringement pursuant to 35 U.S.C. § 271(c) is ongoing.

61. Defendant has committed the foregoing infringing activities without a license to the '371 Patent, but with notice of the '371 Patent.

62. Defendant's foregoing infringing activities were committed willfully and intentionally.

63. Philips has been and will continue to be irreparably harmed and damaged by Defendant's foregoing acts of infringement, and has no adequate remedy at law.

64. As a consequence of the foregoing infringing activities by Defendant, Plaintiff has been damaged in an amount not yet determined.

65. Unless enjoined, Defendant will continue to infringe the '371 Patent.

**SECOND COUNT**

**(PATENT INFRINGEMENT—'349 PATENT)**
**35 U.S.C. §§ 271 AND 281**

66. Plaintiff incorporates and repeats the preceding paragraphs 1 through 56 above as if fully set forth herein.

67. Upon information and belief, Defendant has directly infringed one or more claims of the '349 Patent (including the claims referred to above) pursuant to 35 U.S.C. § 271(a) by

importing, using, selling, and/or offering to sell in the United States products, including, but not limited to, smartphone models such as those listed in paragraph 47.  Upon information and belief, infringement pursuant to 35 U.S.C. § 271(a) by Defendant is ongoing.

68.    Upon information and belief, Defendant has indirectly infringed one or more claims of the '349 Patent (including the claims referred to above) pursuant to 35 U.S.C. § 271(b) by actively and knowingly inducing, directing, causing, and encouraging others, including but not limited to customers and/or end users, to use in the United States Defendant's products (including but not limited to smartphone models such as those listed in paragraph 47) to decode video encoded by using the '349 Patent by, among other things, providing instructions, manuals, technical assistance, and promotional materials relating to the installation, use, operation, and maintenance of said smartphones.  Upon information and belief, Defendant's inducement of infringement pursuant to 35 U.S.C. § 271(b) is ongoing.

69.    Upon information and belief, Defendant has contributed to the infringement of one or more claims of the '349 Patent (including the claims referred to above) under 35 U.S.C. § 271(c) by offering to sell, selling, and/or importing into the United States products including, but not limited to, smartphone models such as those listed in paragraph 47, that include AVC decoders embodied in hardware and/or software that include components especially made or especially adapted for use in practicing the method claimed in the '349 Patent, knowing those components to be especially made or especially adapted for use in the infringement of the '349 Patent.  These components are not staple articles or commodities of commerce suitable for substantial non-infringing use other than to practice the claimed method.  Upon information and belief, Defendant's contributory infringement pursuant to 35 U.S.C. § 271(c) is ongoing.

70.     Defendant has committed the foregoing infringing activities without license to the '349 Patent, but with notice of the '349 Patent.

71.     Defendant's foregoing infringing activities were committed willfully and intentionally.

72.     Philips has been and will continue to be irreparably harmed and damaged by Defendant's foregoing acts of infringement, and has no adequate remedy at law.

73.     As a consequence of the foregoing infringing activities by Defendant, Plaintiff has been damaged in an amount not yet determined.

74.     Unless enjoined, Defendant will continue to infringe the '349 Patent.

## JURY DEMAND

75.     Plaintiff requests a jury trial of all issues in this action so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment in its favor and relief as follows:

A.     Adjudging, finding, and declaring that Defendant is infringing the Asserted Patents.

B.     Adjudging, finding, and declaring that Defendant's infringement has been willful.

C.     Permanently enjoining the sale of each and every device that infringes the Asserted Patents, and permanently enjoining Defendant, its officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with them, from infringing the Asserted Patents.

D.     Ordering that Defendant recall from customers any infringing device not sold to consumers.

E.     Awarding Plaintiff an accounting and damages against Defendant in a sum to be determined at trial, together with interest and costs as fixed by the Court; all of these damages to be enhanced in an amount up to treble the amount of compensatory damages.

F.     Awarding Plaintiff its reasonable attorneys' fees, costs, and disbursements in this action.

G.      Granting Plaintiff such other and further relief as is just and proper.


Dated:  November 8, 2024                      Respectfully submitted,

                                              */s/ Samuel A. Danon*
                                              Samuel A. Danon
                                              sdanon@HuntonAK.com
                                              Tom K. Schulte
                                              tschulte@HuntonAK.com
                                              HUNTON ANDREW KURTH LLP
                                              333 SE 2nd Avenue, Suite 2400
                                              Miami, Florida 33131
                                              (305) 810-2510


                                              Garrard R. Beeney*
                                              Marc De Leeuw*
                                              Stephen J. Elliott*
                                              beeneyg@sullcrom.com
                                              deleeuwm@sullcrom.com
                                              elliotts@sullcrom.com
                                              SULLIVAN & CROMWELL LLP
                                              125 Broad Street
                                              New York, New York 10004
                                              (212) 558-4000

                                              *Counsel for Plaintiff*

                                              *motion for PHV admission to be filed*